UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HUNTER SANDOVAL,

  Plaintiff,

  v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

  Defendants.

Case No. 22-cv-02409-RS

**ORDER GRANTING MOTION FOR LEAVE TO AMEND AND DENYING MOTION FOR SUMMARY JUDGMENT**

I. INTRODUCTION

Plaintiff Hunter Sandoval was arrested during the May 2020 mass demonstrations in San Francisco protesting the killing of George Floyd. He alleges his arrest was carried out with excessive force, in violation of 42 U.S.C. § 1983. He also asserts various claims under state law.[1] Defendants now seek summary judgment in their favor. Sandoval, in turn, moves for leave to file an amended complaint, which contains relatively small changes to some of the factual allegations, drops all but two of the individual defendants, and omits the *Monell* claim.[2]

The motion for leave to amend will be granted. Because the amendments do not give rise

---

[1] The operative complaint was filed jointly by Sandoval and a co-plaintiff, Caroline Dyer. Defendants' unopposed motion to sever the two plaintiffs' claims was granted and this case was opened to litigate Sandoval's claims only. The portions of the complaint relating solely to Dyer will be disregarded in this action.

[2] *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).

to any new issues not addressed by defendants' motion for summary judgment, it will be deemed to be brought against the amended complaint. The motion for summary judgment will be denied.

## II.  BACKGROUND

On May 31, 2020, San Francisco Police Department Captain Michael G. McEachern was leading two units of police officers mounted on motorcycles, a total of twelve officers. The units were monitoring a mass demonstration that had been moving down Market Street toward the Ferry Building. The officers had been assigned to scout ahead of the march and provide information back to other officers. They sought to avoid the crowds and did not seek to make arrests.

A little before 5:00 in the evening, while it was still light and well before an emergency curfew declared by the mayor was to take effect, McEachern and his units stopped on Beale Street at its intersection with Market Street. The marchers were one block away, and headed in the officers' direction. Captain McEachern signaled his team to move east on Market Street in a single column, so they would remain ahead of the protestors.

Before any of the officers started to move, Sandoval and a companion, Joshua Crisler, rode up to the intersection on skateboards. Sandoval testifies that he and Crisler had been participating in the protest, and that he believed the motorcycle officers were intending to intervene and prevent the marchers from continuing. As shown in video recorded by Crisler, Sandoval stopped directly in front of McEachern, within a few feet of the motorcycle's front tire, and got off his skateboard. See Dkt. No. 43, Louie Exh. B - PL Video. Video recorded by McEachern's body worn camera ("BWC") shows Sandoval remained standing in front of McEachern for approximately 10 seconds. See Dkt. No. 43, McEachern BWC clip at 0:11-0:21.

McEachern declares that he told Sandoval something  like, "you need to move" or "please step out of the way." Sandoval asserts McEachern "never raised his hand to wave for me to get out of the way and he never verbally ordered me to move out of the way." McEachern's BWC recording appears to confirm that he did not gesture for Sandoval to move. The sound on the recording, however, was not turned on during this time period, so it sheds no light on whether a

verbal command was given or not.

McEachern contends he then turned his motorcycle to the right in an attempt to navigate around Sandoval. McEachern asserts he "moved forward at a roll" for the distance of approximately one foot. In quick succession, Crisler came from behind Sandoval and blocked the eastbound path, while Sandoval grabbed the front fender of the motorcycle and pushed it to the side.

The video shows a slightly different sequence of events. At the 16 second mark, Sandoval turns away from McEachern to gesture to Crisler to encourage him to step forward. McEachern appears to begin rolling forward toward Sandoval for some short distance before making any effort to turn to the right. Only as the motorcycle reaches Sandoval, and as Crisler moves to his side, does McEachern seem to steer the motorcycle to the right. See Dkt. No. 43, McEachern BWC clip at 0:18-0:22.

McEachern contends that because Sandoval "grabbed" the motorcycle fender and "pushed it to the side," he believed Sandoval intended to knock the bike over. Sandoval declares he was forced to grab the motorcycle only to keep from losing his balance.[3] The video is susceptible to differing interpretations. A jury could reasonably conclude from the video that Sandoval reached out to grab the fender purely as a defensive movement and to maintain his balance when the motorcycle wheel ran into him.[4] Conversely, however, it likely would also be reasonable for a jury to conclude Sandoval had a more aggressive intent, and/or that regardless of the actual intent, McEachern could reasonably perceive an attack.

---

[3] Sandoval asserts he grabbed the motorcycle's handlebars. The video shows it was the fender, not the handlebars. A trier of fact could excuse the error as an understandable mistake in perception and/or memory, or it could weigh it as a factor undermining Sandoval's credibility. It does not, however, affect the analysis at the summary judgment stage.

[4] The series of still images taken from the video and set out in defendants' motion are misleading if not considered in the context of the video. Figure 1 shows the moment just before McEachern began to move forward. Figure 2 shows the motorcycle turned and Sandoval's hands on it. The critical issue is how the first scene developed into the second scene, which the still images do not show.

1  McEachern placed his motorcycle on its kickstand, dismounted, and physically grabbed Sandoval. McEachern asserts he intended to take Sandoval into custody for "attempting to tip him and for obstructing an officer in the course of lawful duties." A struggle ensued. See Dkt. No. 43, Richins BWC clip at 0:22-0:25.

Within seconds, Crisler lunged into McEachern and Sandoval, and they both fell to the ground. See Dkt. No. 43, Richins BWC clip at 0:25-0:27. Crisler, who was still standing, then punched downward towards McEachern. *Id.* at 0:27-0:28. Other officers then pulled Crisler away.

McEachern regained his balance and kneeled next to Sandoval, using control holds to place him under arrest. Sandoval screamed, "No, no, no" as McEachern repeatedly stated, "You're under arrest." Sandoval continued moving on the ground, clenching his hands in front of his body. He tried to sit up, yelling, "Help, help" to the crowd of protesters that were now at the intersection.

Officer Scott Korte arrived to assist McEachern, and they worked together to handcuff Sandoval. Sandoval insisted he could not let go of a plastic bag he was holding, so McEachern allowed him to continue holding it as the cuffs were applied. The arrest and handcuffing took approximately one minute. Korte and McEachern pulled Sandoval to his feet and walked him to a patrol car.

Sandoval was booked into the custody of the San Francisco Sheriff's Office on charges of violating California Penal Code section 245(c) (assault by means likely to cause great bodily injury on a peace officer, a felony) and California Penal Code section 148(a)(1) (resisting, a misdemeanor). He was released later that evening.

### III. LEGAL STANDARD

A. Leave to amend

Federal Rule of Civil Procedure 15(a) provides that, except in circumstances not present here, "a party may amend its pleading only with the opposing party's written consent or the court's leave," which "[t]he court should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). The Ninth Circuit has directed that this policy be applied with "extreme liberality."

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted). In ruling upon a motion for leave to amend, a court must consider whether the moving party acted in bad faith or unduly delayed in seeking amendment, whether the opposing party would be prejudiced, whether an amendment would be futile, and whether the movant previously amended the pleading. *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). "Absent prejudice, or a strong showing of any of the remaining [factors], there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 985 (9th Cir. 2011) (citation omitted).

B. <u>Summary judgment</u>

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id.* at 322-23. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986).

IV. DISCUSSION

A. Leave to amend

Sandoval has offered no real explanation why he did not seek leave to amend at an earlier point in time. Nevertheless, there is no undue prejudice to defendants in allowing the amendment. Defendants submitted a "conditional non-opposition" to the motion, asking only that the amendment not lead to any delay in the proceedings and that Sandoval remove the false arrest claim from the amended complaint, given his assertion in his opposition to summary judgment that he was abandoning that claim.[5]

In light of the liberal standard to permit amendment, the lack of prejudice, and defendants' non-opposition, the motion for leave to amend will be granted. Sandoval will not be required to submit a revised pleading omitting the false arrest claim, but it will be deemed voluntarily dismissed. The proposed amended complaint submitted with the motion is deemed filed.

B. Summary judgment

Defendants' motion for summary judgment is premised on their assertion that all of the remaining claims fail because "under the totality of the circumstances," the force exercised by McEachern to arrest Sandoval was reasonable. A claim that a police officer employed excessive force implicates the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). Accordingly, a police officer's actions are measured by a standard of objective reasonableness. *Id.* at 397. The reasonableness of the force used to effect a

---

[5] The amended complaint omits the *Monell* claim, which Sandoval's opposition to summary judgment also notes he is withdrawing. Sandoval continues to pursue liability against the City and County of San Francisco for his state law claims under a *respondeat superior* theory.

1    particular seizure, in turn, is determined by "careful[ly] balancing . . . 'the nature and quality of the
2    intrusion on the individual's Fourth Amendment interests' against the countervailing
3    governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S.
4    1, 8 (1985)). More simply, "[t]he force which [i]s applied must be balanced against the need for
5    that force." *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997). *See also Alexander v.*
6    *City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994). The strength of the
7    governmental interests depends on the "severity of the crime at issue, whether the suspect poses an
8    immediate threat to the safety of the officers or others, and whether he is actively resisting arrest."
9    *Graham*, 490 U.S. at 396.

10   It is also important to appreciate that police officers "are often forced to make split-second
11   judgments," and that therefore "not every push or shove, even if it may seem unnecessary in the
12   peace of a judge's chambers" is a violation of the Fourth Amendment. *Id*. (quoting *Johnson v.*
13   *Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). It is equally true, though, that even where some force
14   is justified, the amount actually used may be excessive. *Santos v. Gates*, 287 F.3d 846, 853 (9th
15   Cir. 2002) ( citing *P.B. v. Koch*, 96 F.3d 1298, 1303–04 (9th Cir. 1996)).

16   Here, the first instance of "force" in dispute is McEachern's driving his motorcycle into
17   Sandoval. It may be that Sandoval's characterization of the motorcycle as a deadly "impact
18   weapon" overstates how it was used in this instance. Nevertheless, a reasonable fact finder could
19   conclude that McEachern intentionally drove the motorcycle directly into Sandoval,
20   notwithstanding his claim that he had wanted to go around him. Even though the speed at which
21   McEachern was moving minimized the risk, by defendants' own argument the motorcycle was a
22   heavy vehicle that could cause significant damage or injury. While defendants contend that
23   potential exists if the motorcycle falls on someone, a collision with a person, even at a relatively
24   slow speed could lead to such a fall, or could injure the person even if the motorcycle remains
25   upright.

26   Furthermore, under the totality of the circumstances, a reasonable fact finder could
27   conclude *no* use of force was justified. *See Headwaters Forest Def. v. Cnty. of Humboldt*, 240

F.3d 1185, 1199 (9th Cir. 2000), judgment vacated on other grounds, 534 U.S. 801 (2001). ("[W]here there is no need for force, any force used is constitutionally unreasonable."). Indeed, defendants do not attempt to justify McEachern's driving the motorcycle into Sandoval as reasonably necessary to effect his arrest—they do not even contend McEachern had any intent to arrest Sandoval at that point. Rather, they argue the contact between the motorcycle and Sandoval was *de minimus*, accidental, and/or primarily caused by Sandoval himself. As noted above, however, a reasonable jury could find that McEachern deliberately drove into Sandoval, and despite the slow speed, the potential to cause injury existed.

By his own admission, Sandoval was attempting to impede the motorcycle officers from carrying out their duties. Standing alone, however, that would not justify running a motorcycle into him, particularly in the absence of any instruction or command to step aside. While McEachern claims to have given such a command, for purposes of this motion Sandoval's declaration to the contrary must be accepted as true.

Defendants also suggest McEachern lacked alternatives because Crisler moved forward to block his passage to the right and because he could not back up on the motorcycle. McEachern, however, was commanding at least eleven other officers. Even if, as the leader, he did not want to dismount, he surely could have instructed any of the officers to come forward and get Sandoval and Crisler both out of the way, without anyone running motorcycles into either of them. Furthermore, the assertion that he could not back up is inconsistent with video evidence showing one of the mounted officers in McEachern's unit riding his motorcycle forward towards the crowd, and then backing up by several motorcycle lengths before dismounting. See Dkt. No. 43, Korte BWC clip at 2:32-2:42. Accordingly, there is at least a triable issue of material fact as to whether McEachern exercised reasonable force when he drove his motorcycle into Sandoval.

Sandoval next argues that McEachern used excessive force in taking him to the ground and in the ensuing moments while handcuffing him. Even assuming it was reasonable for McEachern to believe that Sandoval had attempted to tip the motorcycle, or that McEachern had probable cause to arrest him for impeding the police apart from any attempt to tip the motorcycle, a

1  reasonable jury could conclude the degree of force employed was excessive. The video evidence
2  does support defendants' contention that McEachern and Sandoval only fell to the ground after
3  Crisler joined the fray. McEachern, however, appears to have initiated the arrest by forcefully
4  grabbing Sandoval and beginning to grapple with him. See Dkt. No. 43, Richins BWC clip at
5  0:24-0:27.  There is no claim Sandoval had attempted to flee. There is no indication he otherwise
6  needed to be physically subdued, before McEachern used that force. Whether it was excessive is a
7  jury question, to be resolved on a complete record, and where credibility determinations are
8  appropriate.[6]

Finally, this is not a case where, despite the existence of a factual question regarding whether defendants acted unconstitutionally, they are nonetheless entitled to judgment on grounds of qualified immunity. The proffered defense is that McEachern was attempting to avoid Sandoval, such that the contact was accidental, *de minimus*, and/or caused by Sandoval's own movements. Defendants do not claim, and could not claim, that a reasonable police officer would believe it permissible to drive a motorcycle intentionally into a person who is doing nothing more than deliberately standing in the officer's way. Similarly, the defense as to how the arrest was carried out will prevail if, but only if, defendants persuade the trier of fact that their characterization of the force used, the threat posed, and the resistance offered, is accurate. Accordingly, the motion for summary judgment must be denied.

---

[6] The video evidence does not support Sandoval's claim that officers punched him during the arrest. A trier of fact may also very well conclude that Korte's participation in the arrest did not include any unreasonable application of force, independent of the propriety of Sandoval's conduct.

## V. CONCLUSION

Defendant's motion for summary judgment is denied. Good cause appearing, the associated sealing motion is granted.

**IT IS SO ORDERED**.

Dated: January 3, 2023

_____
RICHARD SEEBORG
Chief United States District Judge